## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SOLID WOOD CABINET COMPANY,** : | |
| **Plaintiff,** : | |
| : | **CIVIL ACTION** |
| **v.** : | **NO. 13-3598** |
| : | |
| **PARTNERS HOME SUPPLY, et al.,** : | |
| **Defendants.** : | |
| : | |

### MEMORANDUM OPINION

**Rufe, J.**                                                                    **March 13, 2015**

Solid Wood Cabinetry Company ("Solid Wood") filed a Complaint in June 2013, naming

five defendants: Partners Home Supply LLC ("PHS"), and four individuals who are former

employees of Solid Wood and current employees of PHS— Mordechai Basch, Aaron Frankel,

Daniel Polter, and Ariel Griver. The Complaint alleged misappropriation of trade secrets,

tortious interference with contractual relations, breach of contract, and breach of the duty of

loyalty. Before the Court are four motions for partial summary judgment filed by Solid Wood

with regard to the wrongdoing elements of its claims against Basch, Frankel, Polter, and PHS for

tortious interference with contract and breach of the duty of loyalty (but not on the elements of

injury and causation), and a motion for summary judgment filed jointly by the Defendants,

seeking dismissal of all claims against them. For the reasons set forth herein, Solid Wood's

motions for summary judgment will be denied and Defendants' motion will be granted in part

and denied in part.

# I.   BACKGROUND AND UNDISPUTED FACTS[1]

Solid Wood and PHS are companies engaged in wholesale sales of kitchen cabinets and

countertops to commercial customers, including contractors, owners, and managers of multi-unit

residential properties such as apartments and college dormitories. PHS was formed on or about

January 3, 2012, and began sales to commercial customers in the spring of 2012. Solid Wood

and its predecessor in interest, Interstock Premium Cabinetry, LLC ("Interstock"), have been in

the wholesale commercial market since 2003. Wholesale commercial cabinet projects are often

awarded though a competitive bidding process, in which a customer invites multiple vendors to

submit bids to supply cabinetry and countertops. Smaller companies would sometimes contact

only Interstock/Solid Wood for a bid, presumably based upon a past business relationship, but

the companies did not have exclusive supply contracts with any of their wholesale customers. In

order to successfully compete for a project, a supplier must have both adequate inventory and an

acceptable price.

When Solid Wood acquired Interstock's assets and operations in late July 2011,

Interstock employed three full-time wholesale sales representatives—Polter, Frankel, and Ira

Rosenthal—who continued to work for Solid Wood for a time.[2] Defendant Griver was employed

as a retail salesman for first Interstock and later Solid Wood. Defendant Basch worked for

Interstock, and later Solid Wood, in inventory and purchasing. There is no evidence indicating

that the individual defendants were anything but "at-will" employees. Solid Wood asked Polter

and Frankel to sign a non-compete agreement after it acquired Interstock, but there is no

evidence that any of the individual defendants ever signed a non-compete agreement with

---

[1] Except where otherwise noted, the facts come from the parties' Stipulated Statement of Material Facts, Doc. No. 52. Additional facts, also taken from the Stipulated Statement of Material Facts except where otherwise noted, are outlined in the Discussion.

[2] Rosenthal's employment was terminated in early 2012, and he is not a party to this lawsuit.

2

Interstock or Solid Wood.

Griver signed an Employee Confidentiality Agreement with Interstock in March 2007, several months after he began working there. There is no evidence indicating that any other Defendants signed a confidentiality agreement with Interstock or Solid Wood. However, the Solid Wood employee handbook states that employees "must not disclose confidential Company information to any person other than in the proper discharge of the Company's duties."[3] It defines confidential information to include customer lists and undefined "trade secrets."[4] Solid Wood did not provide any specific training to employees regarding confidential information and trade secrets.

After Interstock was acquired and became Solid Wood, Solid Wood made policy changes that impacted employees. For example, Interstock closed to observe certain religious holidays. Under Solid Wood's management, employees were required to use vacation time to observe religious holidays. The company also changed the compensation for sales representatives from salary plus commission to commission only.

Beginning in 2008, Interstock also began selling cabinets and countertops to homeowners in retail showrooms. Over the next three years, the retail business grew, while wholesale revenues decreased. After the acquisition, Solid Wood further expanded the retail cabinetry business and de-emphasized the wholesale business, hiring additional retail sales representatives and opening additional retail showrooms. Solid Wood also closed the Lakewood, New Jersey office, where the wholesale sales department was based, and fired wholesale representative Rosenthal. From the time Polter resigned in April 2012, until June 2012, Solid Wood had only one wholesale representative, Frankel. After Frankel resigned in July 2012, Solid Wood again

---

[3] Doc. No. 52-21, p. 41.

[4] *Id.*

3

had only one wholesale representative. Solid Wood later fired the remaining wholesale representative, and for a time Solid Wood had no wholesale representatives. In October 2012 and May 2013 Solid Wood did hire wholesale sales representatives and began reaching out to former customers for business, indicating that it had decided to "re-embrace the wholesale division."

Solid Wood implemented other changes which negatively impacted its wholesale business. For example, the company required all bid proposals to be reviewed and approved by five different departments, rather than just one. It also stopped extending credit for 30-45 days, or longer, as is common in the industry, and began requiring a 50% down payment with the order. Further, it required the balance to be paid within 30 days for in-stock items. Solid Wood later stopped extending any credit for smaller orders, even for well-established, repeat customers. This change caused at least one customer to stop placing orders with Solid Wood. Solid Wood also experienced supply chain and available inventory issues, causing it to be unable to fulfill some orders placed by clients.

In November 2011, Defendant Basch was contacted by an Ohio businessman, Alan Jaffa, about starting a new wholesale cabinet company. The two men met and discussed the possibility of forming PHS. Additional meetings and planning sessions occurred while Basch was still working at Solid Wood, and Basch developed a business plan for the creation of PHS, which included an estimate of projected sales for 2012, recommended sales margins, an estimate of the number of employees the new company would need, and ideas regarding employee compensation.

On January 1, 2012, Muencz submitted paperwork with the state of Ohio to create PHS, and became PHS's CEO and CFO. Basch accepted an offer of employment from PHS on January 4, 2012, and began working for PHS on January 16, 2012, three days after resigning from Solid

4

Wood. PHS's offer of employment included a provision for a one-time bonus of $30,000 if certain criteria were met, including a 50% gross-profit margin on early sales and the use of his best efforts to recruit Frankel and Polter to PHS. He was initially hired as Director of Product Development, and later became Director of Operations. With Muencz's approval, Basch leased office space in Lakewood, New Jersey for his own use as a PHS employee.

In late 2011, Basch spoke to Polter and Frankel about PHS, discussing the possibility that they might leave Solid Wood to work for PHS. Over the next year, Polter and Frankel both did leave Solid Wood to work for PHS, as did Griver. On February 24, 2012, Polter signed an employment agreement with PHS to become Director of Sales of PHS as of April 15, 2012. Then, Polter continued working at Solid Wood until April 2012, when he resigned without advance notice. The parties dispute the exact date of his resignation. On February 24, 2012, Frankel signed an employment agreement to begin working as co-director of sales for PHS as of August 1, 2012. He remained employed by Solid Wood until July 31, 2012, when he resigned. Griver resigned from Solid Wood as of November 15, 2012, and began working for PHS as a sales representative on November 19, 2012.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if "the materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[6] A fact is "material" if it could affect the outcome of the suit, given the

---

[5] Fed. R. Civ. P. 56(a), (c)(1).

[6] *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

applicable substantive law.[7] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[8]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[9] A court may not weigh the evidence or make credibility determinations.[10] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[11] Where the non-moving party will bear the burden of proof at trial, summary judgment in favor of the moving party is appropriate where the moving party correctly notes that there is an absence of evidence to support essential elements of the non-moving party's claims.[12]

## III.   DISCUSSION

The Complaint contains seven substantive counts, and an eighth count seeking injunctive relief. The substantive counts are as follows: Count I- Misappropriation of trade secrets, asserted against Basch, Frankel, Polter, and Griver; Count II- Misappropriation of trade secrets, pled against PHS; Count III- Tortious interference with contractual relations, asserted against Frankel, Polter, and Griver; Count IV- Tortious interference with contractual relations, pled against PHS; Count V- Breach of contract, pled against Frankel and Polter; Count VI- Breach of contract, pled against Griver; and Count VII- Breach of duty of loyalty, asserted against Basch, Frankel, Polter, and Griver.

---

[7] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[8] Id.

[9] Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

[10] Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

[11] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[12] Celotex Corp, 477 U.S. at 325.

6

Defendants move for summary judgment on all claims against all five defendants. Solid Wood has filed four motions for partial summary judgment, seeking summary judgment on the breach of duty of loyalty claims against Basch, Frankel, and Polter, and on the tortious interference with contract claims against Frankel, Polter, and PHS.

A.     *Claims against Griver*

Solid Wood did not file a motion with regard to the Defendant Griver, and, in its response to Defendants' motion for summary judgment, pointed to no facts which establish a genuine issue of fact as to Griver's liability for misappropriation of trade secrets, tortious interference with contractual relations, breach of contract, or breach of duty of loyalty. In fact, Griver is not mentioned at all in Solid Wood's response. Accordingly, Defendants' motion for summary judgment will be granted as to all claims against Griver.

B.     *Misappropriation of Trade Secrets Claims (Counts I and II)*

Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"),[13] a plaintiff may recover monetary damages for misappropriation of trade secrets. Trade secrets derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from [their] disclosure" and are the "subject of efforts that are reasonable under the circumstances to maintain [their] secrecy."[14] The *prima facie* elements of a trade secret claim are: 1) the existence of a trade secret; 2) confidential communication of the trade secret; 3) use or disclosure of the trade secret in violation of the confidential relationship; and 4) harm to the plaintiff.[15] To claim that certain information is a trade secret, the company must make reasonable efforts to maintain

---

[13] 12 Pa. Cons. Stat. Ann. §§ 5301-5308.

[14] *Id.* at § 5302.

[15] *Moore v. Kulicke & Soffa Industries, Inc.*, 318 F.3d 561, 566 (3d Cir. 2003).

7

secrecy with regard to that information.[16] Formulas, patterns, devices, methods, and techniques, among other things, may be maintained by a company as trade secrets.

Solid Wood argues that Polter and Frankel misappropriated its customer lists for use on behalf of PHS. "Although customer lists may be entitled to protection as trade secrets, they are at the very periphery of the law of unfair competition. A determination of whether a particular compilation of customer data merits protection as a trade secret must be made on a case-by-case basis, and several limitations apply: neither information that can be readily obtained from another source nor information that is not the plaintiff's intellectual property qualifies as a trade secret."[17] When sales associates generate their own sales leads during the course of their employment, these leads are not the property of the employer and cannot qualify as trade secrets.[18]

Although Solid Wood argues that its customer lists were trade secrets, it points to no evidence demonstrating that the names of the entities with which Solid Wood does wholesale business are not readily ascertainable by other means. Moreover, Solid Wood does not dispute the assertion that its sales associates generated their own sales leads and developed their own customer lists. There is also no evidence that Solid Wood took any steps to maintain the confidentiality of its customer lists. Additionally, Solid Wood acknowledges that its wholesale customers routinely request bids from multiple wholesalers, and so accessing Solid Wood's customer list would simply give a competitor an opportunity to submit bids, along with Solid Wood and other Solid Wood competitors.

To the extent that Solid Wood argues that its pricing information is maintained as a trade

---

[16] 12 Pa. Const. Stat. § 5302.

[17] *Brett Senior & Assoc., P.C. v. Fitzgerald*, No. 06-1412, 2007 WL 2043377, *6 (E.D. Pa., July 13, 2007) (internal citations and quotations omitted).

[18] *Id.* at *7.

8

secret, and Frankel and Polter misappropriated such information for use while employed by PHS, Solid Wood points to no facts from which the Court can infer that Solid Wood engaged in reasonable efforts to maintain the secrecy of such information. Pricing information would be provided to potential customers upon request.[19] Solid Wood puts forth no evidence that it imposed any confidentiality requirements on suppliers or on companies requesting bids or price quotes from Solid Wood. Solid Wood also puts forth no factual evidence demonstrating that employees who were privy to pricing information, such as sales representatives Frankel and Polter, were uniformly required to enter into confidentiality agreements or that other efforts were made to protect the confidentiality of such information.

As these are the only alleged trade secrets that Solid Wood argues were disclosed or used improperly by Frankel and Polter, the Court will enter summary judgment on this claim in favor of Frankel and Polter.

Solid Wood also argues that Basch, as a member of Solid Wood's senior management team, had access to the company's financial and accounting system, and that he improperly disclosed confidential information about Solid Wood's profit margins, gross margins, and costs to PHS, which then used that information in creating its business plan. Defendants assume, for the purpose of summary judgment only, that information about profit margins, gross margins, and costs are trade secrets which were communicated confidentially, but argue that Solid Wood has put forth no evidence demonstrating that Basch and PHS misappropriated that information, or that Solid Wood was harmed by the divulgence of such information. However, Solid Wood put forth evidence that Basch produced certain reports containing gross profits margin and other confidential information while still employed by Solid Wood, and may have disclosed the

---

[19] *Id.*

9

information in those reports to PHS and used them to develop a business plan for PHS.

Specifically, in advance of a December 22, 2011 planning meeting, Jeff Muencz (currently CEO and CFO of PHS) sent Basch an e-mail asking him to bring "some historical financial statements" to the meeting, so that Muencz could prepare financial and cash flow models for the new business. Basch indicated that he would try to do so. That same day, Basch prepared a report, using Solid Wood's software and incorporating Solid Wood inventory, cost, and sales data. Basch admits to preparing the report, but testified in his deposition that he did not remember providing this report to Jaffa or Muencz or relying upon it at the PHS planning meeting. Although Basch testified that he did not remember disclosing Solid Wood's confidential information to PHS, and there is evidence that he ran similar reports for Solid Wood on other occasions, the Court finds that the timing is sufficiently suggestive to establish a genuine issue of material fact as to whether Basch provided trade secrets to PHS or used trade secrets to develop a business plan for PHS, at PHS's request. Additionally, Solid Wood put forth evidence that Basch used his personal laptop computer for business purposes while employed by Solid Wood, with Solid Wood's permission, and when he left Solid Wood, he continued to possess certain Solid Wood documents and data on that laptop. These included rolling inventory spreadsheets, projected inventory and inventory needs for 2011 and 2012, and a 210-page report for August 2011, detailing all items sold in that month and including customer names, costs, and profit margins. Solid Wood points to evidence that Basch accessed this information after beginning his employment with PHS, and argues that he may have used this confidential information to benefit his new employer in violation of PUTSA. Basch denies doing so.

The jury will need to assess the factual evidence and the credibility of the witnesses, and determine whether Basch violated PUTSA, and whether he and PHS knowingly used

10

misappropriated information for its own benefit and to Solid Wood's detriment. Accordingly, the Court will deny Defendant's motion for summary judgment as to Solid Wood's PUTSA claims against Basch and PHS.

     C.    *Breach of Duty of Loyalty (Count VII)*

Pennsylvania law dictates that employees owe their employers a duty of loyalty.[20] "An agent's specific duties of loyalty include a duty to refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency relationship, as well as a duty not to use property or confidential information of the principal for the agent's own purpose or those of a third party."[21] To establish a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring[ing] about plaintiff's injuries."[22] In the absence of a restrictive covenant not to compete, an agent may compete with his principal after the termination of his employment. Additionally, at-will employees are free to make plans to compete immediately after terminating the employment relationship, so long as they do not use confidential information acquired from the employer or solicit customers from the employer *while still employed.*[23]

    *Basch*

Solid Wood points to the same evidence regarding Basch's misappropriation of Solid

---

[20] *Synthes, Inc. v. Emerge Medical, Inc.*, 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014).

[21] *Id.* (citing Restatement (Third) of Agency, §§ 8.04 and 8.05).

[22] *Id.*

[23] *Id* at 668; *see also Spring Steels, Inc. v. Molloy,* 162 A.2d 370, 375 (Pa. 1960).

Wood's confidential information in support of its argument that Basch breached his duty of loyalty as a senior management employee of Solid Wood. The Court agrees that the evidence regarding Basch's alleged violation of PUTSA also creates a genuine issue of material fact as to whether he breached his duty of loyalty to Solid Wood.

Solid Wood also argues that Frankel and Polter violated their duties of loyalty to Solid Wood, by diverting customers from Solid Wood or otherwise harming Solid Wood's ability to compete while still working for Solid Wood.

*Polter*

Polter participated in a sales planning conference call with PHS in March 2012, while still employed by Solid Wood. During that call, Polter described anticipated projects for various companies. For example, Polter was the sales representative assigned to the ETC customer account for Solid Wood, and although he was unaware of specific upcoming projects, he knew that there were likely to be 100-unit projects available in May and June 2012. ETC purchased more than $350,000 in wholesale cabinetry from Solid Wood in 2009, 2010, and 2011. In March 2012, Polter advised ETC that he was going to be leaving Solid Wood in April 2012. PHS sold $120,000 in cabinetry to ETC in May, June, and July 2012, after Polter began working there. Polter also discussed a potential 400-unit project for Carabetta, to begin in May or June. Polter was the Solid Wood sales representative assigned to the Carabetta account. Whereas Carabetta purchased over $215,000 in wholesale cabinetry from Solid Wood in 2011, it did not purchase any cabinetry from Solid Wood in 2012. In March and April 2012, Polter corresponded with Lindy Properties, another Solid Wood account to which he was assigned, on behalf of PHS, but the parties dispute the nature and purpose of the correspondence. On April 17, 2012, he provided Lindy Properties with one price quote under a PHS logo, and another with no PHS logo

12

and a Solid Wood mailing address, both noting Polter's PHS email address, but sent from his Solid Wood email address. The parties dispute whether Polter was still working for Solid Wood on April 17, 2012. Polter characterizes all of the above contacts as mere preparations to compete. The Court finds a genuine issue of fact as to whether the above actions indicate that Polter was merely preparing to compete, or demonstrate a negligent or intentional failure to act in good faith and solely for the benefit of Solid Wood while he was employed there.

However, on March 14, 2012, Picerne Real Estate Group contacted Polter at Solid Wood seeking a price quote from Solid Wood for a proposed bulk cabinet order, to be delivered in April 2012. On March 19, 2012, Polter wrote back to say that Solid Wood had the inventory to fill the order, but that he was waiting to hear from the CFO about pricing. On March 21, 2012, his former colleague Rosenthal, now working for PHS, sent Polter an email containing the price quote PHS had provided to Picerne for the project at issue. On March 26, 2012, Polter provided a price quote on behalf of Solid Wood which was approximately $10,000 higher than the PHS quote. Picerne did not place the order with Solid Wood in April, but did make a purchase from PHS. Although Polter argues that it was Solid Wood's own policies that caused the delay in issuing its bid, when deposed, Polter indicated that he had purposely overbid, costing Solid Wood the contract: "I wasn't taking his account. Solid Wood very clearly were not interested in the business. I wasn't going—it was my buddy [Ira Rosenthal] who got fired. I wasn't taking bread off his table. Sorry." This is sufficient to establish that, in delaying submission of the bid, Polter negligently or intentionally failed to act in good faith and solely for the benefit of Solid Wood.

On April 17, 2012, Polter sent an email to Basch from his personal email account, identifying two contact persons at two companies. Basch then sent marketing materials to those

13

individuals on behalf of PHS. Again, the parties dispute whether Polter was employed by Solid Wood as of April 17, 2012. In addition, Polter characterizes these contacts as mere preparations to compete. Thus, there is a genuine issue of material fact as to whether this conduct constituted a breach of his duty of loyalty.

Because the Court finds that Solid Wood has established the first element of a breach of loyalty claim as to one action by Polter—delaying the submission of a bid for the Picerne project—the jury need not decide whether Solid Wood has met its burden as to this element of the breach of duty of loyalty for this conduct by this defendant. However, in its motion for partial summary judgment, Solid Wood did not ask the Court to rule as to the other elements of a breach of duty of loyalty claim: injury and causation; thus the Court cannot enter judgment in Solid Wood's favor as to this conduct, as there are unresolved issues of material fact for trial. In addition, as the Court finds genuine issues of material fact as to whether other conduct by Polter breached his duty of loyalty to his employer, the Court will deny Defendants' motion for summary judgment on this claim as to Polter.

### Frankel

Frankel also participated in the March 2012 sales planning call with PHS, although he was employed by Solid Wood until July 31, 2012. During that meeting, Frankel discussed potential sales to three companies which had placed orders with Solid Wood in the past: Campus Crest, CNC, and Kitchen Connection/Closeout Canada, all of which had new projects beginning over the summer.

Although Solid Wood invoiced over $1.2 million in sales to Campus Crest in 2012, Solid Wood believes some Campus Crest business was lost to PHS beginning in May 2012. Communication between Campus Crest and Solid Wood personnel in July 2012 indicates that

14

Solid Wood failed to timely fulfill cabinet and countertop orders for Campus Crest projects, and Campus Crest became extremely dissatisfied with Solid Wood. Campus Crest may have purchased cabinets from PHS to complete projects Solid Wood was initially contracted to supply, but failed to timely supply due to inventory shortages. PHS also had sales of over $1.5 million to Campus Crest from August 2012 to December 2013, after Frankel began working for PHS.

Kitchen Connection/Closeout Canada was another customer to which Frankel made sales during his employment at Solid Wood, and Frankel's uncle, Yo Aisenstark worked for Kitchen Connection/Closeout Canada. While still working for Solid Wood, on March 23, 2012, Frankel had a sample door sent to Aisenstark at Kitchen Connection/Closeout Canada on behalf of PHS. In April 2012, he sent an email to Aisenstark from his personal email account in which he wrote: "no e-mails that imply anything of the new co over our regular email addresses. . . ." And in May 2012, he participated in a meeting between Muenez of PHS and Aisenstark of Kitchen Connection/Closeout Canada. PHS received over $350,000 in revenue from Kitchen Connection/Closeout Canada from June through December 2012. However, Defendant notes that Kitchen Connection/Closeout Canada continued to purchase cabinetry from Solid Wood until Frankel resigned, and only placed small orders with PHS until Frankel began working there in August 2012. Furthermore, Defendant points to evidence that Solid Wood's problems with maintaining adequate inventory, and not any disloyalty on Frankel's part, accounted for the purchases Kitchen Connection/Closeout Canada made from PHS in June and July 2012.

In the spring of 2012, it appears that CNC, a past customer of Solid Wood, requested a cabinet quote for a new project. Frankel was the sales representative assigned to CNC. PHS sold more than $500,000 in wholesale cabinets to CNC between June and December 2012. This

15

suggests that Frankel may have diverted one or more projects from Solid Wood to PHS, but again, a shortage of inventory at Solid Wood may have led CNC to seek another supplier.

The Court will deny Defendants' motion for summary judgment as to the breach of duty of loyalty claims against Frankel, as Solid Wood has successfully pointed to facts from which a reasonable jury could find that Frankel did act disloyally during this employment with Solid Wood. Solid Wood has established that PHS made sales to certain habitual Solid Wood wholesale customers while Frankel was still employed by Solid Wood, and there are genuine issues of material fact as to whether Frankel's actions contributed to the loss of those customers to PHS.

D.    *Tortious Interference with Contractual Relations Claims (Counts III and IV)*

Solid Wood also alleges that Frankel, Polter, and PHS tortuously interfered with Solid Wood's anticipated future contracts with certain past customers. To state a claim for tortious interference under Pennsylvania law, a plaintiff must plead: 1) the existence of a prospective contractual relationship between the plaintiff and a third party; and 2) purposeful action by defendant to interfere with that prospective relationship; 3) without privilege or justification; 4) causing legal injury.[24] A prospective contractual relation is "something less than a contractual right, something more than a mere hope."[25] To establish a prospective relationship, one must rely upon more than past business dealings.[26] This may be particularly important in an industry in which competitive bidding on projects is the normal course of business, as in the wholesale cabinetry business. Being offered the opportunity to bid for work is not sufficient to create a prospective contractual relation, without evidence that it was reasonably probable that plaintiff

---

[24] *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 357 F.3d 375, 384 (3d Cir. 2004).

[25] *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F. 3d 123, 140 (2005) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979) (internal quotations omitted).

[26] *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2014 WL 2616824 at *19 (E.D. Pa., June 11, 2014)

16

would have been the winning bidder, but for the actions of defendants.[27]

Solid Wood has failed to point to a single existing contract that was interfered with by Frankel, Polter, or PHS. With regard to prospective contracts, although Solid Wood had done business with entities including Campus Crest, Lindy Properties, ETC, and others in the past, it has not provided any evidence that it had a reasonable expectation that, but for Defendants' conduct, it would be the winning bidder for any future contracts with those entities. Solid Wood failed to put forth evidence that it had more than a mere hope of being a successful bidder for any new projects, and thus it does not establish the first element of a claim tortious interference claim. Accordingly, Defendants' motion for summary judgment as to this claim will be granted as to Polter, Frankel, and PHS, and Solid Wood's motion for partial summary judgment as to this claim will be denied.

E.     *Breach of Contract (Count V)*

Finally, Solid Wood asserts claims for breach of contract against Frankel and Polter. Frankel and Polter claim that they were at-will employees, and breached no contract by resigning or by competing after they resigned. Solid Wood put forth no facts or argument in support of the breach of contract claims in its response or sur-reply to Defendants' motion for summary judgment. Accordingly, the Court will grant the motion for summary judgment as unopposed.[28]

IV.    CONCLUSION

For the reasons set forth herein, Solid Wood's Motions for Partial Summary Judgment are denied, and judgment will not be entered in Solid Wood's favor on any claim. However, the Court did make a partial ruling as to Solid Wood's breach of duty of loyalty claim against Polter.

---

[27] *Santana Products,* 401 F.3d at 141; *Synthes, Inc.,* 2014 WL 2616824 at *19; *General Sound Telephone Co., Inc. v. AT & T Commun. Inc.,* 654 F. Supp. 1562, 1565 (E.D. Pa. 1987).

[28] The Court notes that Solid Wood points to no evidence indicating that Frankel and Polter had any contractual obligations to Solid Wood at any relevant time.

17

Defendants' Motion for Summary Judgment is granted as to Count I (Misappropriation of Trade Secrets) as against Griver, Polter, and Frankel, and denied as against Basch; the Motion is denied as to Count II (Misappropriation of Trade Secrets), against PHS only; the Motion is granted as to the Tortious Interference with Contract claims (Counts III and IV); the Motion is granted as to Counts V and VI (Breach of Contract); and the Motion is denied as to Count VII (Breach of Duty of Loyalty) as it pertains to Basch, Frankel, and Polter, and is granted as to Griver. With regard to Solid Wood's demand for injunctive relief pursuant to PUTSA (Count VIII), the Court will grant summary judgment as to Griver, Polter, and Frankel, and deny summary judgment as to Basch and PHS.

An appropriate Order follows.